IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CHARLENE GUTHERY                                                  PLAINTIFF

          v.              Civil No. 12-5025

AT&T UMBRELLA BENEFIT PLAN NO. 1                                 DEFENDANT

MEMORANDUM OPINION

Plaintiff Charlene Guthery brought suit to obtain judicial review of administrative denial of short term and long term disability benefits under an ERISA benefits plan provided by her employer.  The matter is fully briefed and ripe for decision.

1.  Guthery is an employee of AT&T, Inc., and a participant in the AT&T Umbrella Benefit Plan No. 1 (the "Plan"), defendant herein.  Guthery became disabled on October 19, 2008, and received short term disability benefits ("STD Benefits") pursuant to the Plan through December 11, 2008.  The Plan thereafter refused to afford Guthery further STD Benefits, a decision which she here claims was in error.  The parties agree that Guthery has exhausted her administrative remedies with respect to her claim for STD Benefits, and that it is ripe for decision.

Guthery also claims that she is entitled to long term disability benefits ("LTD Benefits") under the Plan, but as a result of the denial of STD Benefits after December 11, 2008, the Plan never reached consideration of whether Guthery was entitled to LTD Benefits.  As to this claim, the Plan contends that Guthery

has not exhausted administrative remedies.

2.    The standard by which the Court reviews an ERISA benefits decision is dictated by the terms of the ERISA plan in question.   Denial of ERISA benefits is "reviewed on a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." **Firestone Tire & Rubber Co. v. Bruch**, **489 U.S. 101, 115 (1989)**.    If the administrator has discretionary authority, its eligibility decisions are reviewed for abuse of that discretion. **Groves v. Metropolitan Life Insurance Co.**, **438 F.3d 872 (8th Cir. 2006)**.

The Administrative Record ("AR") does not contain a copy of the Summary Plan Description ("SPD"), but the Plan has provided one as an Exhibit to the Declaration of Crystal T. Miller, an employee of AT&T Services, Inc., who oversees third party claims administration of the Plan.

The SPD, effective February, 2008, sets out the details of the Plan necessary to a determination of the other issues before the Court, and does not constitute new factual information that was not available to the parties at the time of the disability determination.   Accordingly, the Court will consider it in resolving this case.

3.    The Plan gives full discretion to determine benefits claims and appeals to AT&T, Inc. (the Plan Sponsor); the Plan

Administrator; and "each person to whom review authority has been delegated." The SPD further states that AT&T has delegated authority to determine whether a claimant is entitled to benefits to a Claims Administrator. Under these circumstances, the Court's review of the benefits decision is deferential, rather than de novo, review.

4.   The deferential, or abuse of discretion, standard of review in ERISA cases has been explained as follows:

> Under an abuse-of-discretion standard of review, a plan administrator's decision to deny or terminate benefits must stand if it is reasonable, that is, if it is supported by "substantial evidence." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." So long as the plan administrator's "findings are reasonable, they may not be displaced on review even if the court might have reached a different result had the matter been before it de novo."

**Delta Family-Care Disability and Survivorship Plan v. Marshall**, **258 F.3d 834, 841 (8th Cir. 2001)** (internal citations omitted).

"Substantial evidence" means "more than a scintilla but less than a preponderance." **Govrik v. Unum Life Insurance Co. of America**, **702 F.3d 1103, 1109 (8th Cir. 2013)**.

5.   Other provisions in the SPD that will be relevant in this Memorandum Opinion are the following:

*   STD Benefits provide "some income replacement if an Eligible Employee cannot work, with or without accommodations, because of an approved Total Disability and/or Partial Disability that results from either illness or injury."

-3-

\*     LTD Benefits continue that income replacement if an employee is totally disabled "beyond the Maximum Duration" of STD Benefits.

\*     It appears that in Guthery's job classification, STD Benefits may continue for up to 52 weeks.

\*     Total Disability for STD Benefits means that because of illness or injury, an employee is unable to perform all of the essential functions of her job, or of another job assigned to her.

\*     In order to be considered for STD Benefits, an employee must be under the care of a physician and "follow his or her recommended treatment plan."

\*     Benefits end when the participant no longer meets the requirements for disability; fails to comply with one or more "terms of the Program"; is not under the care of a physician; does not follow the physician's recommended treatment plan; or fails to provide medical documentation or other information reasonably required by the Claims Administrator.

6.   Guthery contends that the AR should be supplemented by the inclusion of documents that were not before the claims administrator at the time her STD Benefits were terminated.  She argues that the Court should include in its review pages 135-329 of the AR, which were submitted to the Plan after February 12, 2009, the date her appeal was denied, and pages 330-425, which pertain to a "relapse claim" which was made in 2010.

-4-

The Plan objects that these materials should not be considered.  It contends that pages 135-329 were not before the claims administrator when it terminated STD Benefits, and that Guthery has not here asserted any rights under the relapse claim, nor has she exhausted her administrative remedies as to that claim.

When courts review administrative decisions under ERISA, "the record that was before the administrator furnishes the primary basis for review." **Trustees of Electricians' Salary Deferral Plan v. Wright**, 688 F.3d 922, 925 (8th Cir. 2012) (citation and quotation marks omitted).

The Court may consider evidence not in the AR only if good cause is shown for its omission, *i.e.*, reasons why it could not have been timely provided. **Rittenhouse v. UnitedHealth Group Long Term Disability Insurance Plan**, 476 F.3d 626, 630 (8th Cir. 2007). Moreover, where there is sufficient evidence to rule on the issues presented, there is little basis for accepting additional evidence. *Id.* at 631.

As explained in **Brown v. Seitz Foods, Inc., Disability Benefits Plan**, 140 F.3d 1198 (8th Cir. 1998),

> [s]uch additional evidence gathering is ruled out on deferential review, and discouraged on de novo review to ensure expeditious judicial review of ERISA benefit decisions and to keep district courts from becoming substitute plan administrators.

**140 F.3d at 1201** (internal citations and quotation marks omitted).

-5-

In the case at bar, because the standard of review is deferential, and because there is sufficient evidence in the AR to rule on the issues presented, the Court has not considered the two categories of medical records to which defendant objects.[1]

7.   The facts relevant to Guthery's STD Benefits claim, as disclosed by the undisputed portion of the AR, are as follows:

*   Guthery had worked in an AT&T call center for 15 years when she was "surplused" and re-assigned to work as a Premises Technician.  Her new job description included lifting up to 80 pounds, climbing ladders and working aloft with hand tools, and performing work "involving bending, kneeling, stooping, crouching, crawling or other uncomfortable positions."

*   Shortly after starting the new position, on October 11, 2008, Guthery fell from a step ladder while working, injuring her back, shoulder and head.  She did not seek medical attention that day, but went to the Emergency Room the following day.  An x-ray showed "calcification projected anterior to the superior aspect of L5 and L4," "loss of the normal lordotic curve," and "joint space narrowing at C5-C6 and C6-C7" with "uncinate spurring," but no evidence of "acute bone injury."

*   On October 15, 2008, Guthery saw Dr. Young at Mediserve Walk-In Clinic ("Mediserve") in Fayetteville, Arkansas.  The Notes

---

[1] This is not to say that good cause for the omission of documents in the challenged portion of the AR has not been shown.  Indeed, as can be seen from the tenor of this Memorandum Opinion, if required to make a ruling on that issue, it is likely the Court would find good cause.

kept by employees of the AT&T Integrated Disability Service Center ("IDSC"), the claims administrator for AT&T disability and workers' compensation claims, indicate that Guthery was referred to this provider by IDSC.

Dr. Young diagnosed a swollen right knee with 'much crepitus," and multiple contusions and abrasions. He prescribed a Medrol Dosepak[2], Flexeril[3], and analgesics, and scheduled Guthery to return on October 22, 2008. He instructed Guthery to do no kneeling, and limited squatting, standing, and climbing.

*   Also on October 15, 2008, IDSC generated a letter to Guthery, informing her that she needed to take steps to have medical information submitted to IDSC by October 28, 2008, in order to be considered for disability benefits. The letter instructed Guthery to sign an Authorization to Release Medical Information ("Medical Authorization") and give it to her treating physician along with a document entitled Instructions to the Physician ("Instructions"). The letter further instructed Guthery that she would not qualify for benefits unless her medical documentation contained "information that establishes that your condition prevents you from performing the duties of your job with or without reasonable accommodations."

---

[2] A formulation of methylprednisolone, an adrenocortical steroid, used to treat, among other things, arthritic conditions. <u>Physicians' Desk Reference</u>, 49th Ed.

[3] "[I]ndicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions." <u>Physicians' Desk Reference</u>, 49th Ed.

The Medical Authorization authorized health information to be made available to IDSC "upon request."  It also authorized IDSC to release that information to "any person or facility that . . . impacts determination of my eligibility for . . . workers' compensation and/or disability benefits . . . to the extent all or any of such health information is considered by AT&T IDSC or its representative to be relevant to the determination of my claim."

An enclosure entitled "Instructions to the Physician" constituted a request from IDSC to Guthery's physician to submit medical records by October 28, 2008.

An enclosure entitled "Instructions to the Employee" instructed Guthery to give her treating physician a copy of the Medical Authorization, and to send a copy of the Medical Authorization with an original signature to IDSC.

    *    The AR contains a document with the heading:

AT&T INTEGRATED DISABILITY SERVICE CENTER (IDSC)
WORKERS' COMPENSATION VS. SHORT-TERM DISABILITY
FREQUENTLY ASKED QUESTIONS

These FAQs state that both workers' compensation claims and disability claims are reported to IDSC.  IDSC then sets up a workers compensation claim ("WC Claim") and a disability claim ("DS Claim").  The FAQs explain that each type of claim is "managed" by several individuals.  WC Claims are managed by a WC Examiner, a Telephonic Case Manager, and a Utilization Review Nurse ("WC Team").  DS Claims are managed by a Disability

-8-

Specialist with input from a Physician Advisor as needed ("DS Team").

One FAQ is "[w]ho provides medical information for my claim?" The answer is:

> It is the responsibility of your Treatment Provider to prepare medical documentation. It is ultimately the employee's responsibility in getting the medical information submitted, however, the AT&T IDSC WC Examiner and Disability Specialist will assist the employee in obtaining medical information.

* On October 17, 2008, Guthery signed and returned the Medical Authorization requested by IDSC.

* On October 22, 2008, Dr. Young saw Guthery, who noted that she "[d]enies any improvement." Medications were continued, and Guthery was referred to Dr. Weilert for pain management. She was allowed to return to work with no squatting or climbing, and partial capacity for standing. The chart notes "Patient Discharged - Disability status to be determined by specialist."

* AT&T had no positions available that could accommodate these restrictions.

* On October 27, 2008, when Guthery had not improved on a regimen of Flexiril, hydrocodone, and ibuprofen, a Mediserve physician charted "To Dr. Weilert for pain management - Restricted duty."

That same date, Mediserve faxed a request to a Selma Mallot, stating "[w]e need approval from WCC to send this pt to pain

management.  Thank you."[4]

     *   On October 29, 2008, Disability Specialist Richelle Cabrales of IDSC wrote Guthery, informing her that she had been approved for benefits from October 19, 2008, through November 11, 2008.  This letter notified Guthery that if she was not sufficiently recovered to return to work by November 11, additional medical documentation would be needed, and that it was her responsibility to provide it.

     *   On October 31, 2008, Guthery contacted IDSC to find out if authorization had been given for her to see the pain management specialist.  She was advised that her case manager would contact her.

     *   On November 5, 2008, Guthery called IDSC again to inquire about authorization to see the pain management specialist.

     *   On November 6, 2008, Guthery saw Dr. McCray at Mediserve.  He diagnosed lumbar strain, and noted that Guthery was worse, with increased radiculitis[5] to her left leg in the past week.  He also noted that she had been referred to Dr. Weilert, who was out until November 17, 2008.  His plan was to obtain an open MRI, and he noted that Guthery was "[u]nable to return to work until after Re-Evaluation on 1-2-09."

---

   [4] While the AR does not indicate who Mallot is, the language of this note indicates that approval was being sought from the workers' compensation carrier to refer Guthery for pain management, and IDSC was handling the WC Claim.  Thus it is reasonable to infer that Mallot was part of the WC Team.

   [5] According to Steadman's Medical Dictionary, 28th Ed., radiculitis is a disorder of the spinal nerve roots.

-10-

That same day Mediserve faxed "Rachelle"[6] at the IDSC fax number, stating "we need approval for MRI (open) due to today's visit."

* On November 12, 2008, Cabrales again wrote Guthery, informing her that she had been approved for benefits through November 25, 2008, and repeating the information about her responsibility to provide additional medical information if such were needed.

That same day, Cabrales created a Note summarizing the Mediserve chart note of November 6, 2008, to the effect that Guthery was worse, and had "been referred to Dr. Wielert who is out until 11/17/08."

* On November 20, 2008, Cabrales spoke with Dr. Weilert's office and was informed that Guthery did not keep her appointment with him.

* On November 25, 2008, Guthery was seen at Mediserve, and the examiner noted that she was "[u]nable to return to work until after Re-Evaluation on [sic] by Dr. Weilert 12/2."  The Mediserve physician (whose signature is illegible) discharged Guthery with the notation "Patient Discharged - Disability status to be determined by a specialist."

Guthery called IDSC that same day, to check on the status of her STD Claim.   Cabrales advised her of the need for updated

---

[6] Probably Richelle Cabrales.

-11-

medical information by November 25, 2008.

* On November 26, 2008, Cabrales called Guthery to advise her that her STD Benefits had been terminated "due to no medicals."

* On December 2, 2008, Guthery was seen by Brent Weilert, M.D., a specialist in pain management.  Guthery presented with "some dull ache as well as some sharp, shooting pains and occasional electrical sensations and numbness and tingling sensations starting across her back and occasionally going down her legs," made worse with activity and helped only minimally by medications.

Dr. Weilert reviewed an MRI showing "mild canal stenosis at L1-2, L2-3 and L3-4 with degeneration," and "a broad based annular[7] disk bulge with extension of disk material into the neural exit foramen[8], more prominent on the left than on the right" at L4-5.  The MRI also showed "multilevel facet hypertrophy."

Dr. Weilert concluded that Guthery "may benefit from a trial of epidural steroid injections versus facet joint injections," and planned to seek permission from "Workers' Compensation" to conduct this trial.

* On December 3, 2008, Cabrales wrote Guthery, informing

---

[7] "Annular" refers to a ring shape.  Steadman's Medical Dictionary, 28th Ed.

[8] A "foramen" is an "aperture or perforation thruogh a bone or a membranous structure."  Steadman's Medical Dictionary, 28th Ed.

her that further benefits on her claim were denied from November 26, 2008 through her return to work date.  The explanation for denial was that IDSC had "not received any medical documentation to substantiate your time away from work."  IDSC had received medical information from Mediserve on November 6, 2008, but nothing since then.  Mediserve had been contacted, and informed IDSC that Guthery had been referred to Dr. Weilert.  Dr. Weilert's office had been contacted, and informed IDSC that Guthery had not kept her scheduled appointment and had no further appointments scheduled.

The letter went on to state:

In order for your claim to qualify for disability benefits, we would need clear documentation from your treating physician that supports why you are not able to perform the essential duties of your occupation.  They would need to document your functional impairments as they relate to your diagnosis.  They need to provide a treatment plan for returning you to work and reasonable restrictions with a reasonable duration.

Cabrales' letter included information on how to appeal this decision, including the statement "[y[ou may also submit additional medical or vocational information, and any facts, data, questions or comments you deem appropriate for us to give your appeal proper consideration."  A set of printed instructions on Appeal Procedures included detailed information about what additional medical information could and should be submitted.

That same day Guthery called IDSC checking to see if her medical information had arrived.

     *   On December 8, 2008, Guthery completed an IDSC Quality Review Unit Appeal Form.  She set forth the following reasons why she was requesting an appeal of the benefits decision:

> Mediserve did not fax medical information on time (Nov. 25th).
>
> I was referred to Dr. Willert [sic] office but missed my appt. due to illness and rescheduled for December 2nd at which time I saw Dr. Willert and he was going to request that I be approved for epidural steroid injections.  His office will contact me as soon as he receives approval to schedule an appointment.

Also on December 8, 2008, Guthery called IDSC, checking yet again to see if her medical information had been received.  According to the Notes, she was told that "no med info has been recvd under this claim but under the WC claim, there new med info that came in."  Guthery asked to speak with her Case Manager, who was not available.

     *   On December 9, 2008, Cabrale returned Guthery's call, and "[a]dvised [her] of what is needed to overturn denial."

     *   On December 30, 2008, IDSC received Guthery's appeal request.

     *   On January 5, 2009, Jose Perez of IDSC wrote Guthery, informing her that her request for appeal had been received, and that she would receive a written response by February 12, 2009. This letter instructed Guthery that "[m]edical records including chart notes, diagnostic tests, and hospital summaries, relevant to this absence should be submitted regardless of the length of the

disability."

      *   On January 6, 2009, Jennie Ringo, IDSC Appeal
Specialist, called Guthery, to review the appeal process.  Guthery
told Ringo that additional medical information would be submitted
for review.

      *   On January 9, 2009, Guthery called IDSC and spoke with
Ringo, informing her that Dr. Weilert was still waiting for
approval to start treatment on her back.  Ringo did not at this
time have the medical records that had been furnished to the WC
Team, and told Guthery that the only way she could review that
medical information was for Guthery to ask the WC adjuster to copy
the medical information to the DS file.

      *   On January 12, 2009, Guthery again called IDSC to see if
her medical information had been received.  She was advised that
Dr. Weilert's chart was received on January 9, 2009.  This was
before any treatment for Guthery's condition had been authorized,
a fact which IDSC knew because of Guthery's call to Ringo three
days earlier.

      *   On January 13, 2009, Guthery again called IDSC to check
on receipt of her medical records.  Ringo told her that a 12/2/08
note had been received from Dr. Weilert.  Guthery told Ringo that
she had had a CT scan and an MRI, and an office visit at Mediserve
on 11/25/08.  Ringo "[a]dvised she may want to follow up with her
[Workers' Compensation case manager] to get the notes faxed over

-15-

to the disability claim."

        *    On January 14, 2009, Ringo reviewed Dr. Weilert's chart
note of December 2, 2008, and summarized it in the file.  She left
out the part about Dr. Weilert's recommendation of "epidural
steroid injections versus facet joint injections" and the fact
that he had to get permission from "Workers' Compensation" to
conduct this trial.

        *    On January 15, 2009, Ringo called Guthery to advise that
she had received Dr. Weilert's December 2, 2008, chart note but
not the CAT scan or MRI report.  Guthery told Ringo that the WC
adjuster had these documents and that she would like to have them
copied to her disability file.  Ringo said she would send an e-
mail to the WC adjuster asking that these two reports be copied to
the disability file.

        *    On January 20, 2009, Ringo again called Guthery, leaving
a voice mail message that she had not received the CAT scan or
MRI.  She advised Guthery that Guthery could request extra time if
needed to "submit medical."  She further advised that the Appeal
Specialist would need to hear from Guthery by close of business on
January 22, 2009, or she would "have to move forward with appeal
process."

        *    On January 23, 2009, Guthery's file was forwarded to two
medical reviewers, Michael Gross, M.D., a specialist in internal
medicine and nephrology, and Jamie Lee Lewis, M.D., a specialist

in physical medicine and rehabilitation, and pain medicine.

        *    On January 30, 2009, IDSC received the report of Dr.
Gross, who had evaluated Guthery's medical records and talked with
a Dr. Price at Mediserve by telephone.  It was Dr. Gross' opinion
that Guthery was not disabled "from an internal medicine[9]
standpoint," but he was careful to note that Guthery "has
significant back pain," and that all her clinical findings "are
related to her back."

        *    Also on January 30, 2009, IDSC received the report of
Dr. Lewis, who evaluated Guthery's medical records and placed a
call to Dr. Weilert, leaving a message on his answering machine.
When no return call had been received in 24 hours, Dr. Lewis
conducted the rest of the evaluation with no input from Dr.
Weilert.

        Dr. Lewis noted the existence of "an MRI documenting a disc
extrusion at the L4-5 level into the foramen," and stated that
"[p]rolonged stooping, bending, or twisting, or lifting heavy
objects would be difficult after acute disc extrusion or
herniation with active radiculopathy[10] and would place the claimant
at increased risk of harm or injury until recovery is made and she
has initiated rehabilitative process."

_____

[9] According to Steadman's Medical Dictionary, 28th Ed., internal medicine is "the
branch of m[edicine] concerned with nonsurgical diseases in adults, but not including
diseases limited to the skin or to the nervous system."

[10] According to Steadman's Medical Dictionary, 28th Ed., radiculopathy is synonymous
with radiculitis.

Dr. Lewis opined that Guthery was disabled until December 11, 2008, but found "no clinical information to support disability as of 12/12/08 to the present," although he did state that from 11/26/08 to the present, "[m]edical documentation suggests that squatting, stooping, climbing, and kneeling would be limited on an occasional basis."

Dr. Lewis based his conclusions on his opinion that "generally" for injuries such as Guthery had sustained, the appropriate length of disability "would be at least 8 weeks." He stated that "[f]urther documentation after initiation of treatment proposed by Dr. Weilert would be needed to extend functional limitations beyond eight weeks."

*   On February 12, 2009, Ringo notified Guthery by letter that IDSC was "partially upholding" the denial of Guthery's STD Benefits. STD Benefits were approved through December 11, 2008, but terminated thereafter. Ringo stated that

> [a]lthough some findings are referenced, none are documented to be so severe as to prevent you from performing the duties of your job as Premises Technician with or without reasonable accommodation from December 12, 2008 through the present.

*   On March 4, 2009, the Notes reflect a call from Guthery's union representative, wanting to know why her STD claim was denied when Workers' Compensation had not released her to return to work.

*   On November 23, 2010, Guthery was released to return to

-18-

work.

      *    On November 24, 2010, Guthery reported to work.

      *    On November 27, 2010, Guthery was again injured at work.

      8.   Based on the circumstances of this case, the Court finds that the Plan abused its discretion in terminating Guthery's STD Benefits.  The AR as summarized above reflects that termination of Guthery's STD Benefits was not supported substantial evidence.

The Court has reference to the following:

      *    Guthery had objective evidence of a significant back injury, an MRI showing a bulging disk.  She followed IDSC's recommendation about whom to consult (Mediserve), and saw the doctors there on October 15, 22, 27, and November 6 and 25, 2008. Her Mediserve physicians took Guthery off work and prescribed various medications. In spite of this regimen of rest and medication, Guthery did not improve.  She worsened, and treatment by a pain specialist was recommended.  No physician at Mediserve ever released Guthery to return to work without restrictions, and AT&T was unable to accommodate the restrictions.

      *    Guthery had not even seen Dr. Weilert when IDSC decided to terminate her STD Benefits for lack of medical documentation, in spite of her five visits to Mediserve.  By the time she saw Dr. Weilert, Guthery had "sharp shooting pains and occasional electrical sensations and numbness and tingling sensations starting across her back and occasionally going down her legs,"

made worse by activity.  Dr. Weilert planned to obtain approval from workers' compensation to try epidural steroid injections.

* There is no evidence that any delay in seeing Dr. Weilert or beginning his proposed plan of treatment was the result of fault on the part of Guthery.  Some delay was occasioned by Dr. Weilert's unavailability.  There was a short delay -- a few days -- caused by Guthery's illness.  Once she saw Dr. Weilert on December 2, 2008, the remaining delay -- before treatment could commence -- was caused by the need to obtain approval from the IDSC WC Team to begin that treatment.  The IDSC Appeals Specialist knew that Guthery was awaiting approval for treatment from the WC Team, and that supporting medical records would not be forthcoming until treatment began.

* The opinions of IDSC's medical reviewers do not support termination of benefits.  Dr. Gross' opinion offers no support whatsoever, relating, as it did, to internal medicine.  Guthery's physical problem was not an internal medicine problem.

Nor does Dr. Lewis' opinion support termination of benefits. It was based on a generalization -- that the minimum length of disability for the type of injury Guthery had sustained was two weeks -- and on the assumption that Guthery had recovered.  Dr. Lewis had no evidence that Guthery had recovered.  Indeed, the records he reviewed showed that Mediserve physicians had taken Guthery off work; that conservative treatment had failed; that she

-20-

had never been released her to return to work without
restrictions; and that she had been referred her to a pain
specialist.

Dr. Lewis also had Dr. Weilert's initial chart note, showing
that he proposed a course of treatment -- epidural steroid
injections -- but had to get workers' compensation approval first.
Thus, Dr. Lewis had no evidence of treatment -- other than the
unsuccessful rest and medication regimen -- on which to base his
opinion.[11]

Moreover, Dr. Lewis was of the opinion that existing medical
documentation "suggests that squatting, stooping, climbing, and
kneeling would be limited on an occasional basis," and Guthery's
job description included stooping, climbing, and kneeling.  AT&T
could not accommodate the limitations noted by Dr. Lewis.  Thus,
to the extent Dr. Lewis's report is probative, it is evidence that
Guthery remained disabled as defined in the Plan , i.e., unable to
perform all of the essential functions of her job, or of another
job assigned to her.

9.   The Plan's main contention for affirmance is that
Guthery failed to document her medical condition.  This argument
is sufficiently countered by evidence that IDSC informed Guthery

---

[11] While Dr. Lewis indicated that treatment began on December 2, 2008, this is not
accurate.  That was the date Guthery first saw Dr. Weilert, and he recommended a course
of steroid injections, but these could not commence until approval had been obtained
from the IDSC WC Team.  The AR contains no evidence that such approval was ever
received, or that treatment was ever begun.

in the FAQs that it would assist her in obtaining medical documentation, and that it had the ability to obtain medical records both directly from the provider, and indirectly from the IDSC WC Team.  Guthery called IDSC repeatedly to inquire whether her medical records had been received, and was obviously having difficulty obtaining them.

In spite of this, there was no effort by the DS Team to assist Guthery in obtaining her medical records, nor any sharing of medical information between the DS Team and the WC Team.  On December 8, 2008, Guthery's DS Team told her that the WC Team had "new med info," but the DS Team did not have it.  On January 9, 2009, Ringo told Guthery that the only way she could review medical information in the hands of the WC Team was for Guthery to ask the WC adjuster to copy the information to the disability file.  This misinformation was repeated on January 13, 2009.  On January 15, 2009, Ringo said she would send an e-mail to the WC adjuster asking for the CAT scan and the MRI, but she still did not have these documents on January 20, 2009.

Based on the foregoing, it is clear that this is not a case where the claimant was lackadaisical about obtaining medical treatment or records of that treatment.  She was having difficulty obtaining both.  Knowing that additional medical records existed, and that IDSC did not have them, Ringo made no effort to assist Guthery in obtaining them, but went forward with the reviews by

Dr. Gross and Dr. Lewis.  Knowing that Dr. Weilert had not even begun treatment of Guthery's injury because he was waiting on workers' compensation approval, IDSC went ahead with the review and termination of benefits.

10.  For the foregoing reasons, the Court finds that there is no evidence to support the Plan's decision that Guthery was able to perform all of the essential functions of her job as of December 11, 2008; that reasonable persons could not have reached that conclusion on the evidence before the Plan; and it was an abuse of discretion for the Plan to terminate Guthery's benefits.

Indeed, the Court concludes that the only reasonable result that could have been reached on the AR before IDSC was that Guthery continued to be totally disabled until November 23, 2009, the date on which she was finally released by the IDSC WC Team to return to work.  As the IDSC WC Team refused to release Guthery to return to work, she could not go to work and therefore remained unable to perform all of the essential functions of her job, or of another job assigned to her.  That is the definition of total disability for STD Benefits under the Plan.

The Court will, therefore, reverse the decision of the Plan to terminate Guthery's STD Benefits, and will direct that the parties meet and confer, and file a document of record -- within 28 days of the file date of this Order -- setting forth the amount of unpaid STD Benefits that Guthery would have received through

October 18, 2009, if AT&T had not terminated her STD Benefits as of December 11, 2008. Judgment for that amount, plus interest, will thereafter be entered.

The Court will further direct the parties to file of record -- also within 28 days of the file date of this Order -- any agreement they may be able to reach on the amount of interest due on the unpaid STD Benefits. Failing such agreement, the parties will be directed -- on that same date -- to file briefs on the issue of what interest rate is appropriate.

11. The Court agrees with the Plan that Guthery has not exhausted her claim for LTD Benefits, because the point at which such benefits would have been claimed was never reached. Because that point should have been reached -- since Guthery was not released by the WC Team to return to work for over 52 weeks from her injury -- as part of the remedy herein provided the Court will remand Guthery's potential LTD Benefits claim to the Plan, with instructions to treat as timely any LTD Benefits claim that Guthery chooses to assert within 28 days of the file date of this Memorandum Opinion.

**IT IS THEREFORE ORDERED** that the Plan's decision to terminate Guthery's STD Benefits as of December 11, 2008, is **reversed**, and the Court will award Guthery judgment for the unpaid STD Benefits that she would have received through October 18, 2009, with interest thereon.

-24-

    **IT IS FURTHER ORDERED** that the parties meet and confer, and file a document of record -- within 28 days of the file date of this Memorandum Opinion -- setting out the amount of unpaid STD Benefits that Guthery would have received through October 18, 2009, if AT&T had not terminated her STD Benefits as of December 11, 2008.

    **IT IS FURTHER ORDERED** that the parties confer, and if possible, file a document setting out the agreed amount of interest due on Guthery's unpaid STD Benefits. Failing agreement, each party is to brief for the Court the issue of what interest rate is appropriate, within 28 days of the file date of this Memorandum Opinion.

    **IT IS FURTHER ORDERED** that Guthery's potential LTD Benefits claim is remanded to AT&T, with instructions that AT&T treat as timely any LTD Benefits claim that Guthery chooses to assert within 28 days of the file date of this Memorandum Opinion.

    **IT IS FURTHER ORDERED** that any motion for attorney's fees is due within 28 days of the file date of this Memorandum Opinion, with response to be filed within 14 days thereafter.

    **IT IS SO ORDERED**, this 26th day of August, 2013.

                **/s/ Jimm Larry Hendren**
                **JIMM LARRY HENDREN**
                **UNITED STATES DISTRICT JUDGE**